JERRY L. GOODE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Goode v. Commissioner
Docket Nos. 11776-79; 11809-79; 11916-79.
United States Tax Court
T.C. Memo 1981-548; 1981 Tax Ct. Memo LEXIS 188; 42 T.C.M. (CCH) 1209; T.C.M. (RIA) 81548; September 28, 1981. Robert E. Giffin, for the petitioner. Robert Kastl, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years 1974, 1975 and 1976 in the amounts of $ 5,539.60, $ 4,155 and $ 936, respectively, and additions to tax under section 6651(a) [1] for the years 1974 and 1975 in the amounts of $ 237.30 and $ 215.84, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: *189 (1) Whether petitioner is entitled to deductions for employee business expenses, including travel expenses, for the years 1974 and 1975 in an amount in excess of that allowed by respondent in the notice of deficiency. (2) Whether petitioner is entitled to a deduction for a dependency exemption for his wife and each of his three children for the year 1974. (3) Whether petitioner is entitled to a deduction for a casualty loss in 1974 because of the removal of his furniture from Air Force storage in that year and, if so, the amount of such loss. (4) The proper amount of petitioner's itemized deductions for each of the years 1974 and 1975. (5) Whether petitioner's failure to timely file his Federal income tax returns for 1974 and 1975 was due to reasonable cause. (6) Whether petitioner is entitled to a theft loss deduction in 1976 because of theft of an automobile and, if so, the amount of such deduction. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Jerry L. Goode, who resided in Columbus, Ohio, at the time of the filing of his petition in this case, filed individual Federal income tax returns for the calendar years *190 1974, 1975 and 1976 with the Memphis Service Center, Memphis, Tennessee. The 1974 and 1975 returns were each filed on August 10, 1977. Petitioner is, and was, during the years here in issue an Air Force officer. During the years here in issue petitioner was stationed at Spangdahlem Air Force Base (Spangdahlem) near Erdorf, Germany. He was assigned to this base as part of the NATO forces of the United States Air Force. The office to which petitioner reported each day at Spangdahlem was approximately 15 miles from petitioner's residence. The base itself consisted of approximately 35 square miles. Petitioner's particular position required that he travel from one building to another on the base to properly discharge his duties. Petitioner was not furnished with an automobile for this travel and, although there was a bus available on the base, it was not practical for petitioner to use the bus for transportation because of the time element involved. Petitioner used his automobile more on some days than on other days in traveling from one building on the base to another in his line of duty, but on the average would drive approximately 15 miles a day and drove for approximately *191 250 days. This driving was in addition to the driving petitioner did to and from the base. Petitioner did approximately the same amount of driving on the base in connection with his work in 1975 as he did in 1974. In 1975 there was a change in petitioner's assignment at Spangdahlem and, starting in March, he began working as the chief of air field management rather than command post controller. Thereafter, in addition to traveling around Spangdahlem petitioner was required to drive on business on several occasions to Bitburg Air Base which was between 20 and 25 miles from Spangdahlem. The planes at Spangdahlem were F-4 Phantom Jets. Petitioner was a navigator qualified for flight in several forms of aircraft, but not in an F-4. In order to maintain his flight qualifications and obtain his flight pay during 1974, he was required to fly a certain number of days or a certain number of hours. The closest base to Spangdahlem from which petitioner could fly to maintain his current rating was Ramstein Air Base (Ramstein) which was between 75 and 100 miles from Spangdahlem. On at least 18 occasions during 1974 petitioner drove to Ramstein to fly in planes in which he was qualified *192 in order to keep his current rating and receive his flight pay. On some of the trips petitioner would drive to Ramstein and because of weather conditions would be unable to fly and would return to Spangdahlem without having done the necessary flying to keep his current rating. He would then have to return to Ramstein on another occasion. When petitioner stayed overnight in connection with his flying at Ramstein, he usually stayed in military quarters for $ 6, but at times there would be no space available and he would have to stay in a motel near the base. Petitioner kept a record of the cost of his room and his food in a diary. The total cost of lodging to petitioner in connection with his trips to Ramstein was $ 159, and the total cost of meals to petitioner in connection with these trips, according to the records he kept in his diary, was $ 572.50. In 1975 petitioner had been a qualified navigator for over 14 years and, in accordance with the Air Force rules put into effect in that year he was not required to fly to receive his flight pay and he ceased his trips to Ramstein in January or February of 1975. Petitioner was married in 1962 to Sharon Kay Goode. Petitioner *193 and Mrs. Goode had three children, Katherine, Cheryl and Jonathan, who were all minors in 1974. Petitioner and Mrs. Goode had come from Germany in late 1973 to the United States on leave. Petitioner, Mrs. Goode and Jonathan returned to Germany in early January 1974 and lived in a house provided by petitioner until approximately February 1974 when Mrs. Goode and Jonathan returned to the United States. In late 1973, petitioner and his wife were having marital difficulties and for that reason the two daughters did not return to Germany with them. Petitioner and his wife were contemplating separating at the time they returned to Germany. During the year 1974 petitioner, in addition to paying the expenses on the home in which he and his wife and son lived for a month to six weeks, supplied funds to Mrs. Goode through checks drawn by or to her in the amount of $ 6,603 for the support of herself and the three children. Petitioner also repaid amounts loaned to Mrs. Goode by her family in 1974 in the total amount of $ 667.80, paid medical expenses for Mrs. Goode and the children in the total amount of $ 95.75 and sent checks directly to the children in the amount of $ 65. Commencing *194 in November 1974, petitioner had an allotment made to Mrs. Goode from his military pay of $ 300 a month and this amount was sent directly to Mrs. Goode by the United States Air Force in November and December of 1974. Mrs. Goode was not gainfully employed during 1974, and, except for approximately two months after her return from Germany when she stayed with her family, lived in an apartment in Columbus, Ohio. The children lived with Mrs. Goode in this apartment except for times when they were visiting with relatives. When petitioner was ordered to Germany he had all of his household effects stored by the United States Air Force on a permanent basis. The Air Force had his household goods stored with Wagners Service, Inc. in Springfield, Ohio. When petitioner returned to the United States for a short visit in 1974, he learned that the household goods had been released on a signature purporting to be the signature of Sharon Kay Goode on April 14, 1974. Petitioner made a list of the goods which he had placed in storage and estimated a value of those goods which totaled $ 19,523. Petitioner made inquiries of the warehouse in an effort to find where the goods were located but was *195 unable to locate them. Later in 1977, in connection with a custody proceeding involving petitioner and his wife Sharon, petitioner made an arrangement to get three boxes of the goods returned to him and, in accordance with the arrangements made between petitioner's lawyer and his wife's lawyer, these three boxes were returned to him. No other portion of petitioner's household goods have been returned to him. Prior to 1974, petitioner had borrowed funds on two life insurance policies. He repaid these loans in 1973 and 1974, and in 1974 paid a total of $ 266.12 interest in connection with repayment of these loans. Petitioner was required in his work at times to wear fatigues and flight suits which could not be worn off the base or when he was not actively engaged in his work at the base. Petitioner spent a total of $ 100 in 1974 in maintaining these uniforms, including cleaning and purchases of incidental items. In 1974 petitioner gave at least $ 200 to the Base chapel at Spangdahlem where he attended church on a rather regular basis. During 1974, petitioner enrolled in some courses offered by the University of Maryland at Spangdahlem and in connection with these courses *196 paid approximately $ 225 for tuition, books and incidental items. Petitioner was required to maintain a telephone in his home in connection with his work at Spangdahlem.The telephone had a base cost and, in addition, whenever it was used a meter ran and the calls made were charged at varying rates, depending on the distance of the place called from the place from which the call was made. Petitioner paid a total of $ 1,800 in 1974 for the instrument charge and call charges on the telephone in his home. Petitioner used the telephone for personal calls, but many of the calls placed on the telephone were business calls which petitioner was required to make in his work. At least 10 percent of the telephone calls made by petitioner in 1974 were business-related costs. In 1972, petitioner purchased a 1963 3000 Mark III Austin Healey automobile for $ 150. It was an old, unusual custom-built car. Petitioner did not drive the car much after he purchased it or during the winter of 1972-1973. In the spring of 1973, when petitioner began to drive the car, he had difficulty with the transmission and contacted the person from whom he had bought the car, who was a mechanic, to see if he *197 could help him repair the car. Thereafter petitioner had repairs done to the brakes, the gas tank, the radiator and almost all parts of the car. At the end of 1974, he had spent over $ 1,700 in repairing the automobile. During 1975 he continued to have the car repaired and at the end of 1975 he had spent approximately $ 2,350 in repairs. In 1975, he turned the car over to mechanic who was supposed to make additional repairs on the car and upgrade it into road-worthy condition so that petitioner would be able to bring the car back to the United States when he returned in 1976 or 1977. The mechanic with whom petitioner placed the car had a small garage in a village in Germany. After petitioner left it with this mechanic, he went on a vacation. When petitioner returned from his vacation he found that the mechanic's lease had run out and he had been evicted from the garage. Petitioner had a friend who knew the landlord, and his friend called the landlord who assured him that petitioner's car would be left on his lot and would be safe there. Petitioner began to look for another mechanic to work on his car and, when he located one, he and the mechanic went to the garage and found *198 that the car was missing. He located the mechanic to whom he had turned the car over for repairs and that mechanic told petitioner that he did not know where the car was. Petitioner filed a theft report with the military police who worked on the case jointly with the German police.A little over a week after petitioner filed the theft report, the police found petitioner's car. It had been dismantled and placed on cinder blocks. The windshield was broken, the seats were taken out, the dash was dismantled and the wheels were gone. Petitioner judged that the car, in the condition it was found, was not worth more than $ 100 to $ 200 and, in his opinion, in the condition it was when he turned it over to the mechanic for final repair, it was worth around $ 4,000. Petitioner employed a German lawyer to prosecute an action against the mechanic who he believed had converted the car to his own use and dismantled it. Petitioner had hoped to recover on this suit, but the mechanic who he was suing was arrested on drug charge and left Germany before the suit could be prosecuted. The man petitioner was suing left Germany either around the end of 1976 or very early in 1977. Petitioner had *199 no theft insurance on the automobile. In 1977, petitioner again attempted to put the car into road-worthy condition. Petitioner considered the car to be approximately 95 percent road-worthy and picked it up from the mechanic who was working on it, but while he was driving it the wheels came off on the front end of the vehicle. Petitioner was required by military orders to return to the United States within two days after this happened, and he abandoned the car. In 1975, petitioner attempted to contact his wife to obtain some information from her to assist him in filing his 1974 return. He was unable to contact her. Petitioner was in Germany and, because of being unable to contact his wife, postponed filing his tax return. In 1976, when petitioner's 1975 tax return was due to be filed, he was having the same difficulty contacting his wife and therefore did not timely file his 1975 tax return. The following schedule shows the deductions claimed on petitioner's tax returns for the years 1974, 1975 and 1976 which were disallowed in whole or in part by respondent in the notice of deficiency and the amounts disallowed and allowed: Deductions
Disallowed
Allowed
Claimed by
by
by
Petitioner
Respondent
Respondent
1974
Business Expenses [1]
$ 2,530
$ 925
$ 1,605
Dependency Exemption
3,000
3,000
0
Casualty Loss
9,900
9,900
0
Child Care
4,800
4,800
0
Itemized Deductions [2]
15,615
14,700
915
1975
Business Expenses
1,668
1,000
668
Dependency Exemption
3,000
3,000
0
Casualty Loss
5,858
5,858
0
Child Care
1,750
1,750
0
Itemized Deductions [3]
8,286
7,608
678
1976
Business Expenses
2,327
1,000
1,327
Theft Loss
1,900
150
1,750
Itemized Deductions--
Contributions [4]
200
78
122
*200 *201 OPINION The issues in this case are all factual. [2]
*202 The first issue concerns the amount of business expense deductions, including travel expenses, to which petitioner is entitled in the years 1974 and 1975. As heretofore pointed out, petitioner on his 1974 return claimed total business expense deductions of $ 2,530 and respondent in his notice of deficiency allowed only $ 1,605 of this amount. There is no specification in the deficiency notice of which items were allowed. However, on the basis of the evidence, we conclude that petitioner did drive his automobile at least 5,500 miles for business purposes and therefore is entitled to deduct the $ 825 he claimed to be deductible for business use of his automobile. Petitioner was required to maintain his flight efficiency in order to receive flight pay. It was necessary for him to drive to and stay overnight at Ramstein in 1974 in order to comply with the requirement that he maintain his flight efficiency. Petitioner is entitled to deduct the unreimbursed cost of his meals and lodging for the trips to Ramstein as well as the cost of driving to and from Ramstein. Petitioner kept contemporaneous records of his travel expenses in Ramstein in 1974. We have reviewed those records *203 and, without going into specific detail, conclude that petitioner has established in accordance with the provisions of section 274 that he expended for business travel in the year 1974 the amount of $ 159 for lodging and the amount of $ 572.50 for meals, making a total of $ 731.50 for meals and lodging. On the basis of this record, we conclude that the 5,500 miles claimed by petitioner for business travel included the driving of his automobile to and from Ramstein. The other items included by petitioner in claimed travel expenses were either unexplained or were items, such as auto repair, to which petitioner is not entitled when he uses the 15 cents per mile applied to his mileage to determine automobile expenses. On the basis of this record, we conclude that petitioner has established that he spent $ 180 for the business use of his telephone and $ 100 for cleaning and maintenance of his uniform. The evidence offered by petitioner with respect to his education expenses in 1974 is totally insufficient to show that these expenses were business expenses. The record does not show the nature of the courses petitioner took nor how these courses related to his employment. We therefore *204 conclude that petitioner is properly entitled to deduct $ 1,836.50 of his claimed business expense deduction of $ 2,530 for 1974 rather than only the $ 1,605 allowed by respondent. The record is totally inadequate to show that petitioner is entitled to business expense deductions in 1975 in excess of the $ 1,000 allowed by respondent. Petitioner had no records to support his claimed meal and lodging expenses in 1975 and therefore did not comply with section 274 with respect to these expenses. The record indicates that petitioner's business automobile expenses in 1975 would be less than in 1974. We have set out in some detail the amount petitioner expended in 1974 for the support of his wife and three children. The total of the payments made by petitioner for the support of his wife and three children in 1974 is over $ 8,000. The record shows that petitioner's wife was not gainfully employed in 1974 and, although it is not clear from the record, the inference is that the amount furnished by petitioner for the support of his wife and three children in 1974 was their major support, if not their entire support. On the basis of this record, we conclude that petitioner is entitled *205 to a dependency exemption for his wife and each of his three children in the year 1974. In spite of much testimony with respect to petitioner's claimed casualty loss in connection with his furniture in 1974, the facts show that petitioner stored the furniture in his name in a warehouse used by the Air Force to store furniture for military personnel ordered on overseas duty until their return to this country. When petitioner's wife returned to the United States separately from him, she withdrew the furniture from storage. It appears that thereafter there was considerable litigation between petitioner and his wife with respect to many items, including child custody and removal of the furniture. On the basis of this record, we conclude that petitioner has failed to show that any loss he may have sustained because of the removal of his furniture from Air Force storage was a casualty or theft loss. [3]
*206 The issue with respect to petitioner's claimed itemized deductions for 1974 and 1975 is difficult to follow. Respondent disallowed only the casualty loss and child care amounts of the itemized deductions claimed by petitioner in each of these years. The other claimed deductions were not disallowed but, rather, respondent determined that the standard deduction exceeded the allowable itemized deduction. Certainly, petitioner cannot deduct his business telephone expenses and uniform expenses both as a business deduction and as an itemized deduction. We have allowed the claimed deduction for uniform upkeep and telephone as a business expense deduction in 1974 and therefore these items are not allowable as an itemized deduction. There is nothing in this record to support any itemized deductions for petitioner in 1974 or 1975 in excess of those allowed by respondent. Petitioner on his return for 1974 claimed a charitable contribution deduction of $ 200. This claimed deduction was not disallowed by respondent. Petitioner in his petition again claimed a deduction for charitable contributions of $ 200. At the trial petitioner testified that he had made charitable contributions *207 in 1974 of $ 300. This claim was based on his estimate that he contributed $ 20 each time he attended services at the Base chapel and a reconstruction from notations he had made as to his attendance at the Base chapel. We have accepted many of petitioner's reconstructions from the various notations he made on papers which he testified filled three brief cases.However, from the record we conclude that petitioner has not established that he contributed more to charity in 1974 than the $ 200 claimed on his tax return and in his petition and allowed by respondent. We therefore hold that the charitable deduction to which petitioner is entitled in 1974 is $ 200. The only items claimed as itemized deductions by petitioner which we have not previously discussed are the medical expense deductions and the general sales tax. Apparently respondent did not disallow the $ 80 of medical expenses claimed by petitioner. Petitioner in his petition did not claim any error by respondent with respect to the medical expense deduction for 1974. Respondent did not disallow any of the $ 315 of interest deduction claimed. Therefore, petitioner is entitled to this claimed deduction. Respondent concedes *208 that petitioner is entitled to deduct sales tax on the basis of the tax tables. Whether itemized deductions properly claimed by petitioner will exceed the standard deduction can be determined by the parties in a computation under Rule 155 of the Tax Court Rules of Practice and Procedure.
Petitioner's tax returns for the years 1974 and 1975 were filed in 1977. Petitioner conceded that these returns were not timely filed but argues that he had reasonable cause for the late filing due to the difficulties he was having with his wife in 1974, 1975, 1976 and 1977, until his return from Germany. In our view, petitioner has totally failed to show that the difficulties he was having with his wife constitute reasonable cause for failure to timely file his 1974 and 1975 returns.We therefore hold that respondent properly determined the additions to tax under section 6651(a) for each of these years because of petitioner's late filing of his returns. The final issue is whether petitioner is entitled to a theft loss deduction in 1976 because of the theft of his Austin Healey automobile and, if so, the amount of the deduction to which he is entitled. On his tax return for 1976 petitioner *209 claimed a theft loss in connection with his Austin Healey automobile of $ 2,000 which, after the reduction of $ 100, resulted in a claimed deductible amount of $ 1,900. In a note attached to his return he explained the claimed deduction in much the same way as he testified at the trial and as set forth in our findings. Respondent in his notice of deficiency allowed $ 150 of petitioner's claimed theft loss deduction in 1976 and disallowed $ 1,750. Respondent in the notice of deficiency did not give any specific explanation of the basis for the allowance of $ 150 and the disallowance of the balance. The facts unmistakably show that petitioner's Austin Healey car for which he had initially paid $ 150 and on which he had expended an additional $ 2,350, making a total of $ 2,500, was stolen in 1976. The record shows that petitioner pursued all avenues of recovery, but by the end of 1976 it was fairly apparent that he would be unable to recover any portion of his loss. The real problem here is the fair market value of petitioner's Austin Healey car before and after the theft. Petitioner testified that before the theft the car had a value of approximately $ 4,000 and after the theft *210 a value of only $ 100 to $ 200. If these figures were accepted, petitioner of course would be limited in his deduction to his basis in the car, which would be $ 2,500 less the $ 200 value when the car was recovered, or $ 2,300. Although the record is not as precise as it might be, from the detailed testimony which petitioner gave as to the expensive parts he put into the car and as to the type of car he had, which he referred to as "a classic," we conclude that petitioner suffered a theft loss in 1976 in excess of the $ 150 allowed by respondent. Considering the record as a whole, we conclude that petitioner's estimate of the loss on his return of $ 2,000 was reasonably accurate and we therefore hold that after the subtraction of the $ 100 petitioner is entitled to the $ 1,900 theft loss deduction claimed on his 1976 income tax return. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
1. The business expenses claimed by petitioner consisted of automobile expenses of $ 825 on the basis of 5,500 miles at 15 cents per mile; meals, lodging and travel expenses for 47 days, 30 nights, at $ 40 a day of $ 1,200; professional education of $ 150; uniform cost and cleaning of $ 100; communications cost-telephone of $ 180; additional educational cost of $ 75. Total cost--$ 2,530. ↩
2. The $ 14,700 of itemized deductions disallowed by respondent were comprised of the $ 9,900 casualty loss and the $ 4,800 child care expenses. The amount of $ 915 of claimed itemized deductions not disallowed by respondent was less than the $ 1,000 standard deduction used by respondent in his computation of petitioner's 1974 tax liability. ↩
3. Petitioner claimed $ 8,286 of itemized deductions, including the casualty loss and child care expenses. After disallowance of these amounts by respondent, the balance of $ 678 of itemized deductions allowed was less than the $ 1,300 standard deduction which was used by respondent in computing petitioner's 1975 tax liability. ↩
4. Included in the itemized deductions of $ 3,374 claimed by petitioner on his return were the contributions and theft loss deductions disallowed by respondent to the extent of $ 1,872. Respondent allowed the balance of the itemized deductions of $ 1,502, but the amount was less than the standard deduction of $ 2,400 which was used by respondent in computing petitioner's tax liability for 1976.↩
2. In the stipulation and at the trial the following items were either conceded by one party or the other or agreed to by the parties: 1. Petitioner conceded that respondent's disallowance of his claimed child care deductions in the amount of $ 4,800 and $ 1,750 for the years 1974 and 1975, respectively, are proper. He also conceded that the disallowance of his claimed deductions for dependency exemptions for the year 1975 and the disallowed part of his claimed charitable contribution and travel expenses for 1976 are correct. 2. The parties stipulated that of the amount of $ 5,858 claimed as a casualty loss by petitioner in 1975 as an itemized deduction, the amount of $ 2,857.10 was properly deductible in arriving at petitioner's adjusted gross income. 3. Respondent conceded that petitioner is entitled to the deduction for sales tax in each of the years here in issue based on the tax tables. The only portion of the claimed itemized deductions disallowed in 1974 and 1975 were the casualty loss and child care deductions and in 1976 a portion of the theft loss deduction and a portion of the charitable contributions deduction.Respondent's position is that the itemized deductions do not exceed the amount of the standard deduction to which petitioner is entitled. Petitioner, for the year 1974, claimed as part of itemized deductions uniform maintenance and cleaning and telephone expense. However, on his return these amounts were claimed as business expenses. Respondent, in disallowing a portion of petitioner's claimed business expenses in 1974 did not specify which items were allowed or disallowed. Therefore, in making our determination we will determine the total amount of the business expense deductions claimed by petitioner which are allowable to ascertain if in fact that amount exceeds the amount of the business expense deductions in 1974 allowed by respondent under the designation of travel expense.↩
3. At the conclusion of the trial, petitioner's counsel stated that he would like to file a brief with respect to whether the circumstances shown in this record were sufficient to show a theft under Ohio law. The Court allowed time for such a brief to be filed on behalf of petitioner. However, petitioner's counsel later informed the Court that he did not intend to file such a brief. Having no assistance from either party as to how Ohio law might consider a dispute between a married couple as to household furnishings, we have gone into no analysis of that law but, rather, have concluded on the basis of this record that petitioner has failed to show any casualty or theft loss with respect to the furnishings.↩